UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

ANGELA CLONTZ,                                       Case No. 1:16-cv-1022

         Plaintiff,                                 Black, J.
                                                 Bowman, M.J.

    v.

COMMISSIONER OF SOCIAL SECURITY,

         Defendant.

**REPORT AND RECOMMENDATION**

Plaintiff Angela Clontz filed this Social Security appeal in order to challenge the Defendant's finding that she is not disabled. *See* 42 U.S.C. §405(g). Plaintiff presents three claims of error for review. As explained below, I conclude that the ALJ's finding of non-disability should be REVERSED, because it is NOT supported by substantial evidence in the record as a whole.

**I. Summary of Administrative Record**

In January 2013, Plaintiff filed concurrent applications for supplemental security income ("SSI") and for Disability Insurance Benefits ("DIB") alleging disability based on multiple physical and psychological conditions, with a disability onset date of February 1, 2007, when she was 38 years old. She is insured, for purposes of DIB, only through December 31, 2012.

After her applications were denied initially and upon reconsideration, Plaintiff requested an evidentiary hearing before an administrative law judge ("ALJ"). On April 28, 2015, ALJ Peter Boylan conducted an evidentiary hearing, at which Plaintiff appeared and gave testimony, as did a vocational expert. (Tr. 43-81). Following the

1

hearing, the ALJ issued a written decision in which he concluded that Plaintiff's severe impairments of affective disorder, spine disorder, multiple arthropathies, status-post sinus surgeries, anxiety disorder, and asthma did not meet or equal any Listing that would entitle her to a presumption of disability, under 20 C.F.R. Part 404, Subpt. P, Appx. 1. (Tr. 16-17). Instead, the ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to perform the demands of a limited range of light work, further limited as follows:

> She can frequently climb ramps and stairs but can never climb ladders, ropes or scaffolds. She can frequently stoop, kneel, crouch or crawl. She must avoid concentrated exposure to fumes, odors, dust, gases and poor ventilation. She can perform simple, routine and repetitive tasks. She cannot perform at a production-rate pace, such as generally associated with jobs like assembly line work, but can perform goal-oriented work, such as generally associated with jobs like office cleaner. She can perform no fast-pace work. She can make simple, work-related decisions. She can tolerate occasional and superficial interaction with coworkers and supervisors. She can have no interaction with the public as part of her job duties. She can tolerate occasional changes in a routine work setting.

(Tr. 19). Plaintiff was 46 years old, still a "younger individual" at the time of the evidentiary hearing, with a high school education. Based upon testimony from a vocational expert ("VE"), the ALJ found that Plaintiff was not under a disability because she could perform jobs that exist in significant numbers in the national and regional economies, including the representative positions of cleaner/housekeeper, small-products assembler, and inspector. (Tr. 32).

The Appeals Council denied further review, leaving the ALJ's decision as the final decision of the Commissioner. Plaintiff filed a judicial appeal in this Court, arguing that the ALJ erred in negatively assessing her credibility, erred in rejecting the opinions of her treating physicians, and erred by failing to address the number of days she would be absent from work in determining her residual functional capacity ("RFC").

2

**II. Analysis**

**A. Judicial Standard of Review**

To be eligible for benefits, a claimant must be under a "disability." *See* 42 U.S.C. §1382c(a). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted). In conducting this review, the court should consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion.... The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts. If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.* (citations omitted).

In considering an application for supplemental security income or for disability benefits, the Social Security Agency is guided by the following sequential benefits

3

analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform his or her past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform his or her past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy. *See Combs v. Com'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920.

A plaintiff bears the ultimate burden to prove by sufficient evidence that she is entitled to disability benefits. 20 C.F.R. § 404.1512(a). A claimant seeking benefits must present sufficient evidence to show that, during the relevant time period, she suffered an impairment, or combination of impairments, expected to last at least twelve months, that left him unable to perform any job. 42 U.S.C. § 423(d)(1)(A).

**B. Specific Errors**

The Commissioner concedes that the ALJ made several errors in this case, but argues that each of the errors was harmless. Based on the record as a whole, the Commissioner encourages this Court not to remand for what the Commissioner asserts would be a "useless formality." *See Rabbers v. Com'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009). So long as substantial evidence supports the same conclusion, and the errors are deemed "harmless," then this Court will affirm. *Keeton v. Com'r of Social Sec.*, 583 Fed. Appx. 515, 524 (6th Cir. 2014)

The Commissioner's argument is not without appeal, especially when considering the errors individually. At the same time, when the undersigned considers the errors in combination, and how those errors permeated the ALJ's entire analysis, the undersigned concludes that "substantial doubt" exists as to whether the Commissioner would have made the same ultimate finding with the errors removed from the picture. "Where a subsidiary finding is unfounded, the court will remand the case to the agency for further consideration ... if 'the court is in substantial doubt whether the administrative agency would have made the same ultimate finding with the erroneous finding removed from the picture[.]' " *Berryhill v. Shalala,* No. 92–5876, 4 F.3d 993, 1993 WL 361792 at *7 (6th Cir. Sept. 16, 1993) (quoting *Kurzon v. U.S. Postal Serv.,* 539 F.2d 788, 796 (1st Cir.1976)). The primary errors that give the Court concern are the extent to which the ALJ minimized Plaintiff's chronic sinus infections and failed to explain the basis for finding that she would not frequently be absent from work.

**1. Credibility Assessment**

Plaintiff first argues that the ALJ erred in making an adverse credibility determination. Such claims rarely warrant remand.

An ALJ's credibility assessment must be supported by substantial evidence, but "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Com'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). Further, a credibility determination cannot be disturbed "absent a compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). Thus, it is proper for an ALJ to discount the claimant's testimony where there are contradictions among the medical records, her testimony, and other evidence. *Warner v. Com'r of*

*Soc. Sec.*, 375 F.3d at 387, 392 (6th Cir. 2004). Observing Plaintiff's demeanor and evaluating her testimony in this case, the ALJ specifically gave "little weight" to her testimony, finding her "statements concerning the intensity, persistence and limiting effects of [her] symptoms [to be] not entirely credible for the reasons explained in this decision…." (Tr. 20). Even when an ALJ's opinion reflects errors in the analysis, if "substantial evidence" remains to support the adverse credibility determination and the error(s) do not "negate" the validity of the ultimate credibility conclusion, the error is deemed harmless. *Ulman v. Com'r of Soc. Sec.*, 593 F.3d 709, 714 (6th Cir. 2012) (quoting *Carmickle v. Com'r of Soc. Sec.*, 533 F.3d 1155, 1162 (9th Cir. 2008)).

The ALJ provided significant support for his adverse credibility determination in this case. Plaintiff testified that she could sit, stand and walk for only twenty minutes and could carry only five pounds. (Tr. 61). However, the ALJ found that the longitudinal medical evidence did not support those claims. (Tr. 26). He noted that despite Plaintiff's complaints of significantly limiting back pain including radicular symptoms, her diagnostic tests reflected either no significant abnormalities or only mild findings, up until early 2014. (Tr. 21). Other records reflected that some of Plaintiff's complaints related to her inability to lift her grandson, who lives with her and who she babysits 2-3 times per week. Those complaints contrasted sharply with her hearing testimony that she could lift only 5 pounds. (Tr. 61). Several exams confirmed good range of motion in all major joints, normal motor and sensory function, and full strength in her extremities. (*See* Tr. 21). In early 2014, a lumbar spine MRI showed a "mild" disc bulge <u>without</u> nerve root involvement, and Plaintiff was referred to a pain management physician, who once again observed no significant signs of back problems. (Tr. 22).

Plaintiff was referred for 12 sessions of physical therapy, but did not return after the first two visits. (Tr. 22).

Despite his reliance on the referenced evidence, however, the ALJ made several errors that had a substantial impact on his analysis. The first error is evident in the ALJ's description of Plaintiff's chronic sinus problems as "a remote history…that largely resolved prior to the alleged onset date" of February 1, 2007. (Tr. 22). Contrary to the ALJ's statement, Plaintiff's first sinus surgery was two weeks after her onset date, on February 14, 2007. Although the ALJ did acknowledge records showing Plaintiff had "difficulties recovering" from her February surgery, the ALJ made a second error in stating that postoperative diagnostic imagery showed "no abnormalities." (Tr. 22). The referenced CT scan reflects a "marked deviation of the nasal septum to the left," and "bilateral maxillary sinusitis." (Tr. 500-502).

Plaintiff underwent a second sinus surgery on November 21, 2007, after which she continued to have recurrent sinus infections. (Tr. 560 (1/22/08), 559 (3/17/08), 558 (4/18/08), 557 (9/8/08), 555 (10/24/08), 553 (11/4/08), 619 (2/16/09)). Another CT scan on March 2, 2009 again reflects Plaintiff's deviated left septum and continued "[m]ild ethmoid chronic sinusitis" with "[m]inimal mucosal thickening in the right maxillary antrum." (Tr. 625). Plaintiff continued to experience frequent sinus infections requiring medical treatment. (Tr. 632, 618 (5/1/09), 617 (5/7/09), 614 (11/14/09), 613 (2/9/10), 612 (10/19/10), 610 (03/07/11), 630 (7/7/11), 609 (8/18/11), 629 (1/05/12) 635-36 (3/22/12)). A third CT scan taken March 26, 2012 showed persistent, extensive mucosal thickening throughout the paranasal sinuses, and partial opacification of the bilateral ethmoid air cells. (Tr. 640). Again, the records reflect continued frequent sinus infections requiring regular medical treatment. From December 2012 through May

2014, for example, records reflect at least 14 visits for such treatment, with infrequent 2-month spans free from infections. (*See* Tr. 1031-1033 (12/29/12), 1022-1025 (2/25/13), 1011-1014 (3/4/13), 1091-1098 (7/11/13), 1206 (9/6/13), 1130-1133 (10/24/13), 1127-1129 (10/29/13), 1204 (11/5/13), 1102-1103 (11/18/13), 1121-1124 (12/4/13), 1117-1120 (2/8/14), 1199 (2/27/14), 1198 (3/7/14), 1197 (5/19/14)). However, Plaintiff appears to have had fewer sinus infections between May 2014 and March 2015. (*See, e.g.*, Tr. 1195 (10/14/14), 1194 (10/23/14), 1243-1245 (3/2/15)).

While the ALJ references ongoing sinus treatment and did not wholly disregard the record, his characterization of her condition as "largely resolved" prior to her disability onset date, coupled with his misrepresentation of the diagnostic imagery, significantly undermine his analysis. The Commissioner maintains that the error was harmless because the ALJ accurately pointed to evidence that Plaintiff's longitudinal records reflected that she had only sporadic emergent care visits over time, and was often able to treat her sinus problems at home. (Tr. 1031, emergency department note dated 12/29/12, reflecting patient's report that she "is usually able to manage" her chronic sinusitis at home). However, the above medical evidence leads the undersigned to conclude that the ALJ's mischaracterization of the record and minimization of Plaintiff's chronic sinus problems was not harmless.

In addition to the errors concerning Plaintiff's chronic sinus issues, the ALJ pointed out that Plaintiff "conspicuously refused to accept any narcotic medications prescribed for her" by her pain management specialist for her back pain. (Tr. 22). Although a failure to comply with recommended treatment may be considered in assessing credibility, Plaintiff testified that the reason she declined narcotic medications was based upon her history of alcoholism and drug abuse, and fear of new addiction.

8

Before drawing an adverse inference from her refusal of treatment, Plaintiff's explanation should have been acknowledged.[1] Somewhat diminishing the impact of this error, however, the ALJ properly noted that Plaintiff also failed to follow through on other treatment for her back pain, such as physical therapy.

Last, Plaintiff argues that the ALJ further erred by discounting her credibility based upon her ownership of four dogs. The ALJ reasoned:

> Despite having over 180 environmental allergies, the claimant has four dogs (53F/33). Although the claimant indicated that she does not have an allergy to dogs per se, their fur certainly harbors other allergens or irritants to which the claimant would react. Therefore, although she is not allergic to dogs specifically, the fact that she lives with four of them raises doubts about the intensity and limiting effects of her allergies.

(Tr. 26). Because the ALJ acknowledged her testimony that she did <u>not</u> have a specific allergy to dogs, Plaintiff asserts that his criticism is speculative and based upon personal opinion. However, Plaintiff's testimony about her alleged lack of a dog allergy is itself contrary to the record, since dogs are listed as one of many "individual Allergens" to which Plaintiff is allergic. (Tr. 473). Therefore, any particular error in criticizing Plaintiff's ownership of four dogs was harmless.[2]

### 2. Weighing the Medical Opinion Evidence and Formulating Plaintiff's RFC

Plaintiff's other two claims of error are closely related. She contends that the ALJ erred in weighing the medical opinion evidence, and more specifically by rejecting the residual functional capacity ("RFC") opinions of two of her treating physicians, Drs.

---

[1] The Commissioner contends that the ALJ did not use Plaintiff's refusal of medication to support his adverse credibility determination. Given the placement of the sentence in the context of the credibility analysis and the judgment-laden statement that Plaintiff "conspicuously" refused treatment, the undersigned concludes that the refusal of treatment was one of several reasons used to discredit Plaintiff.
[2] The ALJ also fairly criticized Plaintiff's continued decision to smoke despite her asthma and sinus problems. (Tr. 26).

9

Scheidler and Boxer  Additionally, she alleges that the ALJ failed to adopt (or even to address) the opinions that she would miss 4 or more days of work each month.

Unlike in many social security cases, the ALJ here did not rely upon the opinions of any particular physician in formulating Plaintiff's RFC.  The ALJ gave "little" weight to the opinions of three treating physicians (Drs. Scheidler, Boxer, and Willbrand), only "some" weight to an examining consultant (Dr. Swedberg), and "no weight" to assessments of various other physicians who opined on the ultimate issue of disability. (*See* Tr. 28).  The ALJ's failure to rely on any particular medical opinion reflects no error, so long as substantial evidence supports his analysis.  However, remand is required because the same type of minimization of Plaintiff's sinus issues that plagued the ALJ's credibility analysis also impacted his assessment of the opinions of Drs. Scheidler and Boxer.

### a. Dr. Scheidler

Dr. Scheidler has been Plaintiff's primary care physician since 2006.  On April 27, 2015, Dr. Scheidler completed a "medical assessment" form regarding Plaintiff's physical abilities.  He opined that –  as of April 2015 - her chronic myalgias "worsen" with "repetitive carrying heavy items," and opined that she could carry less than 5 pounds at a time for 2.5 hours during the workday, and not more than 5 pounds totaling 2.5 to 5 hours throughout the workday. (Tr. 1448).  He opined that "excessive walking" also increases her myalgias, stating that she can stand and walk only 1-2 hours total or without interruption in a day, and sit for just 3-4 hours.  Because those postural limitations total less than 8 hours per day, they would be work-preclusive.  (Tr. 1448-1449). Dr. Scheidler further opined that she would be "off task" a work-preclusive amount of 50-75% of the day due to pain, but hand-wrote that the question was "hard to

accurately determine due to subjective nature…." (Tr. 1451). Last, he opined that Plaintiff's impairments or treatment would cause her to miss four or more days of work each month. (Tr. 1452).

The ALJ gave Dr. Scheidler's opinions "little weight," concluding that they were not well-supported. Specifically, the ALJ found his treatment records "contain little description of his findings" and that "his examination findings contain very little supporting explanation or description," with "no references to diagnostic testing or clinical findings, with the exception of muscle tightness." (Tr. 28). The ALJ also pointed out that Dr. Scheidler "has no specialized expertise that lends credence to his assessment." (Tr. 28).

In fact, no medical evidence at all documented significant orthopedic problems, and a May 2013 consultative examination by Dr. Swedberg was "completely normal." Notably, Plaintiff does not point to any medical evidence to support Dr. Scheidler's extreme postural limitations, or testing to support the extreme lifting restriction. Likewise, although Dr. Scheidler documented Plaintiff's subjective reports of radiating pain on earlier dates (though not as early as Plaintiff's alleged onset date in 2007),[3] the diagnostic evidence did not show significant abnormalities from 2007 through early 2014. (*See* Tr. 26). Her doctors have prescribed only conservative treatment, including injections and physical therapy – and Plaintiff quickly discontinued the latter treatment.

Despite the existence of substantial evidence to discount many of Dr. Scheidler's extreme opinions (particularly those relating to postural limitations), the undersigned remains troubled by the ALJ's mischaracterization of records that reflect frequent

---

[3]The alleged period of disability spans more than 8 years. The RFC opinions offered by Dr. Scheidler do not indicate whether Dr. Scheidler believes that Plaintiff experienced the same level of limitations throughout that period, or only as of April 27, 2015.

11

medical visits for sinus infections and other conditions, with accompanying notations of clinically observed symptoms. Although the ALJ noted that "several specialists found no objective pathology" to explain Plaintiff's continued sinus complaints, (Tr. 26), the records cited by the ALJ were dated between her first and second sinus surgeries, during a period in which Plaintiff had been referred to another ENT (Dr. Tami) for a second opinion. The ALJ appears to confuse Dr. Tami's inability to find a definitive root cause of Plaintiff's continuing symptoms with a lack of "objective pathology," as if Dr. Tami was suggesting that Plaintiff had no "real" symptoms. However, no physician has discredited Plaintiff's experience of recurrent sinusitis. In fact, a March 2007 CT scan close in time to Dr. Tami's note documented abnormalities "consistent with acute sinusitis" along with a "marked deviation of nasal septum to the left." (*See, e.g.*, Tr. 500-503).

In addition, the ALJ mischaracterized Dr. Scheidler's use of the phrase "somatic dysfunction" as a reference to psychosomatic symptomology. (*See* Tr. 28, erroneously referring to Dr. Scheidler's use of the phrase "somatic dysfunction" as reflective of a psychological component to …subjective complaints and indicat[ive] that they do not entirely stem from true physical problems"). The Commissioner acknowledges this "likely" error,[4] but argues it was harmless when one considers that at one point in his records, Dr. Scheidler does refer to a psychosomatic component of Plaintiff's symptoms. Specifically, on April 5, 2007, Dr. Scheidler hypothesizes that Plaintiff *may* be experiencing "psychosomatic effects…adding to [her] slow [post-surgical] recovery" based in part on her history of depression and ongoing anxiety. (Tr. 1067; *see also* Tr.

---

[4]Dr. Scheidler is a doctor of osteopathic medicine, and the Commissioner concedes that the ALJ "likely" misconstrued Dr. Scheidler's use of the term "somatic" (meaning the whole body system) as referring to a psychological component of Plaintiff's condition. (*See* Tr. 1447).

23). If this were the only error, the undersigned might agree that it was harmless. However, in considering the totality of the record as a whole, it adds to the conclusion that remand is required.

### b. Dr. Boxer

Plaintiff began treating with Dr. Boxer, a psychiatrist, in December 2012. On February 16, 2015, Dr. Boxer completed a "medical assessment of ability to do work related activities," offering his opinions concerning Plaintiff's mental limitations. Dr. Boxer states that he treats Plaintiff for post-traumatic stress disorder and bipolar disorder (depressed). (Tr. 1440). He rates Plaintiff's abilities to follow work rules, use judgment, interact with supervisors, and function independently as only "fair," and rates four other work-related abilities as "poor," citing Plaintiff's significant depression and anxiety, for which he increased her medication dosing on the same date that he completed the mental RFC form. He opines that she has a "very difficult time being around people with whom she is not familiar, particularly, but not exclusively, men. Such encounters lead to intense anxiety, confusion, stuttering, forgetfulness." (Tr. 1441). Although Dr. Boxer opined that Plaintiff has a good ability to understand, remember and carry out simple job instructions, other limitations were more work-preclusive. For example, he states that she has "poor" abilities to relate predictably in social situations or to demonstrate reliability. He explains that 3-4 days per week she has "really bad days when she cannot imagine leaving her house," and "[e]ven on better days, she requires encouragement to leave home." (Tr. 1442). He concludes that she is likely to miss four or more days per month from work as a result of her impairments or treatment. (Tr. 1444).

The ALJ explained that he gave "little" weight to Dr. Boxer's assessment because it was not well-supported and was inconsistent with other substantial evidence.

> The record does not support Dr. Boxer's assertion that the claimant's forgetfulness would inhibit the claimant's work-related abilities (54F/3). To the contrary, the claimant adeptly met her family's needs, especially in a time of crisis where they abruptly lost their housing. Furthermore, while Dr. Boxer described the claimant's ability to make social judgments as generally poor due to her inability to leave the house, the record documents many instances of the claimant leaving the house. Specifically, she volunteered at her grandson's school and ran Alcoholics anonymous meetings.

(Tr. 30). The ALJ acknowledged Dr. Boxer's treatment relationship but found that "the record overall does not support or comport with" his assessment. (Tr. 30).

> Notably, nothing in the medical evidence substantiates Dr. Boxer's claim that the claimant would miss four or more days of work a month. In fact, much of the notes from Dr. Boxer's office illustrate that fleeting stressors, including family and housing problems otherwise. [sic] Additionally, contrary to Dr. Boxer's observation that the claimant *never left the house*, the record references the claimant taking a trip to Florida and riding motorcycles. Although Dr. Boxer's expertise as a psychiatrist lends some weight to his opinion, it does not outweigh the aforementioned problems with [his] assessment. Although Dr. Boxer's assessment does not warrant much weight, the aforementioned residual functional capacity nevertheless accounts for many of the restrictions that he espoused.

(Tr. 30, emphasis added).

Plaintiff complains that the ALJ unfairly overstated and mischaracterized Dr. Boxer's opinion as stating that she "never left the house." I agree that the ALJ overstated Dr. Boxer's opinion in that regard. At the same time, the ALJ provided multiple reasons for finding that Plaintiff was less limited by her mental impairments than suggested by Dr. Boxer. On January 15, 2015, Plaintiff's therapist noted that Plaintiff "appears to have excellent insight and judgment," (Tr. 1271), and other notes reflect Plaintiff's ability to quickly find new housing after she and her husband were evicted from the home they had been renting. Additional records reflect Plaintiff's ability

14

to attend and lead AA meetings and sponsor many women, as well as her abilities to go on annual vacations to Florida from her alleged onset date up until 3 years prior to the hearing, to go camping, and to volunteer at her grandson's school. (Tr. 30, 49, 64-66, 1380, 1296, 1382, 1441-1442). A therapist's note dated April 2013 refers to her being a driver in a motorcycle parade for a charity event. (Tr. 30, 66, 967).

Despite some support for the ALJ's determination that Plaintiff was less limited by mental limitations throughout the 8-year period of claimed disability than found by Dr. Boxer,[5] the undersigned concludes that the Commissioner should re-evaluate his medical opinion on remand. The psychiatric evidence includes treatment records that, at least for some periods of time, required Plaintiff to see a therapist weekly, in addition to medication management visits to Dr. Boxer.[6] When one considers the frequency with which Plaintiff's acute and chronic physical and mental illnesses required medical treatment,[7] her two treating physicians' opinions that she would frequently be absent from work based upon a combination of her symptoms and treatment are not as easily dismissed – at least not without greater analysis than the ALJ provided here.

The vocational expert testified that an absentee rate of just 2 days per month – half the rate opined by Plaintiff's physicians - would be work-preclusive when considering an individual with Plaintiff's other limitations. (Tr. 78-79). However, the ALJ provided almost no discussion regarding absenteeism. The "good reasons" rule requires more explanation on the record than presented in this case. *Accord Sharp v. Barnhart*, 152 Fed. Appx. 503, 508-510 (6th Cir. Oct. 26, 2005)(reversing and

---

[5] Like Dr. Scheidler, Dr. Boxer's RFC form does not indicate whether he believes that Plaintiff remained at the same level of impairment throughout her lengthy claimed period of disability.
[6] When a claimant's symptoms wax and wane, an ALJ must determine whether the claimant remains capable of *sustained* employment.
[7] Many people with chronic conditions are not precluded from work activity merely because they must attend frequent medical appointments, but the present record is undeveloped in this regard.

remanding because substantial evidence did not support rejection of opinions of treating physicians that plaintiff's impairments would force him to miss ten days of work a month).

### III. Conclusion and Recommendation

This is a case in which remand is required for further fact-finding, as the mixed evidence presented in this record does not entitle Plaintiff to benefits, but is not so one-sided that remand would be a useless exercise. Because the referenced combination of errors creates "substantial doubt" as to whether the Commissioner would have made the same ultimate decision throughout the claimed disability period if the errors were corrected, **IT IS RECOMMENDED THAT** Defendant's decision be **REVERSED** and that this case be **REMANDED** for further fact-finding under sentence four.

                     _/s Stephanie K. Bowman_
                     Stephanie K. Bowman
                     United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

ANGELA CLONTZ,                                Case No. 1:16-cv-1022

      Plaintiff,                              Black, J.
                                              Bowman, M.J.
v.

COMMISSIONER OF SOCIAL SECURITY,

      Defendant.

**NOTICE**

Pursuant to Fed. R. Civ. P 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).